Mr. Cunningham Good morning. May it please the court, my name is Mark Cunningham. I represent Veritext Corporation. Veritext has appealed a district court decision dismissing its antitrust claim and three constitutional claims. Each of these claims turns on the same set of facts, the most straightforward analysis is with the antitrust claim, so I'll begin there. With respect to the antitrust claim, the district court said twice that we had stated a claim upon which relief could be granted. The district court, however, in a motion for reconsideration dismissed on Parker immunity grounds, finding that the defendants were ipso facto immune as state actors. The problem with that decision is that it's the wrong standard. NC Dental makes it clear that when you have a specialized board like the board here, and when it's controlled by market participants, it's then subject to the McDowell test, not Parker. There is no ipso facto immunity. Instead, the defendants, in order to obtain that immunity, need to show, first, that they acted pursuant to a clearly articulated policy of the State, and, two, that they were actively supervised. The district court did not engage in that analysis and, again, just assumed this kind of ipso facto immunity, which clearly does not exist here. Do I understand six of the nine members of the board are private? That's absolutely correct, Your Honor. Are they just court reporters? The First Amendment complaint alleges it's a specialized board that's majority controlled by court reporters, all of whom have an interest in raising prices. The number is six to nine. The First Amendment complaint also alleges, and this is important for NC Dental purposes, that this is not just a board that was at risk of regulatory capture, but, actually, there was shown in the facts, alleged, that there actually was capture here. The market participants had caused this board to engage in a whole host of conduct that the district court recognized would, in fact, state a claim for relief. That conduct, in fact, included a document, a meeting agenda, that we attached to the complaint, which made it clear that all these court reporters were going to get together to discuss how they could raise prices. Well, the State has a right to regulate, but it does not have a right to put private parties who are unsupervised in that role. And that's what was going on here, and that's why NC Dental applied. We alleged very extensive price-fixing allegations, beginning at paragraphs 1-4, 8-11, 12-15, 19-37, 57-59, and then Exhibits 1 and 2 of the First Amendment complaint. Additionally, in addition to sort of meeting to discuss prices and coordinating on prices, you also have these board members taking the statute at issue, Article 1434, and recognizing and applying it, interpreting it to apply not just according to its terms, but to apply to a broader set of people, in this case insurance companies who are not party litigants. So what they said was court reporters cannot have contracts with court reporting groups who are doing business or obtain volume discounts for insurance companies when those insurance companies are paying for the defense of an insured in litigation, even if the insurance company is not a party to the litigation. Article 1434 is originally — But they would be interested in the outcome of the case. Absolutely. There's no question that they would have potentially an interest in the outcome of the case, but for purposes of analysis here, you have market participants making that interpretation without any supervision of the board, of the State, which is what's critical here for purposes of immunity. And — Is there any evidence as to why the board suddenly started to take these actions in 2012? I mean, this law was enacted in 95, right? Yeah. So for almost 20 years, there was no effort to enforce the law. But the First Amendment complaint does allege that there came a point in time where court reporters were complaining, and they decided as a board to get together and to start to enforce it. And so there are three critical — What are they complaining about? They're complaining about court reporter rates and how to get them higher. Not about corruption or ethics? Not about corruption or ethics. Now, you can go back, and the First Amendment complaint talks about where all of this anti-contracting originated. And, you know, it originated at the national association level of court reporters, where they were, in fact, talking about it in terms of ethics, in terms of the appearance of impartiality. And before adopting any rule, though, this national association went and sought an opinion from a business review letter from the Department of Justice. The Department of Justice said, look, you can adopt some ethical rules to address your impartiality concerns with respect to contracting, but what you can't do, what the antitrust laws prohibit, is prohibiting volume-based discounts. And what happened is you now have a board that, if it were the State itself, in fact, regulating, but you have a board here of private actors making these decisions. And it's the fact that they're private actors that makes all the difference in the world for purposes of NC Dental. And we can look at the cases that, in fact, the defendants here rely on, on NC Dental, to say that NC Dental doesn't apply. Their main case is Edgar, which is a Fifth Circuit decision. And before NC Dental, there is no doubt Edgar would have applied. Edgar dealt with a Louisiana board that was controlled by market participants, and it said, look, even though this board is controlled by market participants, we think, not that Parker applies, but that Halley applies, so that we are going to give immunity to this particular board, even though it's controlled by market participants, because we do think it's an arm of the State. Well, that decision in Edgar, in fact, created part of the circuit split that then led to NC Dental. And, Judge Southwick, you may recall that you were part of a case. It's not precedent because it's unpublished, but in Rogers v. State Board of Nursing, 665 Federal Appendix 326, 2016, a panel of this court, per curiam, decided, or noted and recognized, that NC Dental clarified the circumstances under which a board, when it is captured by private market participants, when immunity does and does not apply, or how you, in fact, decide immunity. So you have that case that recognizes that NC Dental clarified Edgar. But you also have more recent decisions, and again, this decision is not precedential, because it was a decision by the FTC Commission. But the FTC, just on April 10th of this year, decided in a case that it brought, after our case, but against the Louisiana Board, the Louisiana Board of Real Estate Appraisers of 2018, FTC, Lexus 40. Here, this board is similar to our board. It's majority-controlled by market participants, and the FTC decided that, in fact, NC Dental applied, and, in fact, granted summary judgment on the issue in favor of the government saying there is no immunity here. And, ironically, in that case, the State argued against the FTC. It argued that this is a fact-based issue. You can't decide these issues of active supervision and control at a summary judgment phase. But here, we're in a motion-to-dismiss phase, and I have the same State arguing just the opposite. It's a different board, albeit. But here, this issue of fact is critical in this context, because we were dismissed without discovery. We were dismissed at the 12B6 stage. And so, we just don't think that these fact-based issues should have been decided at this time, even if the correct immunity standard had been applied. Ultimately, it also is worth noting that this is an affirmative defense, and so does the defendant's burden. Turning now to the Equal Protection and Due Process clauses, here, there's no doubt that there is a deferential standard that's applied. The State, if it wanted, could regulate prices for court reporters. It could say, look, we think that there needs to be a living wage for court reporters, and so we're going to set that wage at X dollars per page or per day. The State has the right to do that. But what it doesn't have the right to do is give control over that process to private market participants. Once it does that, an appropriate economic right of the State turns from being a plausible way for the State of obtaining its objective to a situation where you have the State authorizing price-fixing by private market participants. And if you accept that, then you have to reach the conclusion that, in fact, there is no rational relationship when there's price-fixing, because price-fixing, as the Supreme Court has been very clear, serves no social utility. It's pernicious, and that's why it's per se unlawful. The Supreme Court has also been unclear and has also been very, very clear in this context that, with respect to professional boards, ethics are never, are never actually promoted or advanced by price-fixing. And so if you accept the allegations in this complaint, in the complaint that they state a claim for price-fixing and other antitrust violations, which the district court agreed it did, then you should also find that in this case, at least as applied, this particular statute has to fall because it's been a statute that was given to be administered by a board that was operated or controlled by private market participants who had every incentive to, in fact, abuse their, abuse the power of the state. And that is ultimately the question, right, with respect to equal protection and due process, you know, was this a purposeless law? Was it arbitrary? Well, it becomes purposeless. It becomes arbitrary when the state gives price-fixing authority to private parties. That's the key. And so no matter which way you turn here, once the state has given private parties the right to actually engage in rank price-fixing, then there cannot be immunity, and there also cannot be a rational basis because it's implausible that price-fixing can actually achieve any legitimate purpose that the state may put out there. We don't, you know, again, disagree. The state has the right to engage in economic regulation all it wants, absolutely. What it doesn't have the right to do, where it starts to violate equal protection and due process, is when it gives that right to private to market participants who are unsupervised. Kennedy. Counsel, you have pulled out this price-fixing focus. I'm certainly taking it further. I believe your friends on the other side say you have. That was done previously in the lower court. What has happened here is prohibition on long-term or volume-based contracts, which you say has the effect of eliminating some discounts and other advantages, economic advantages that could come. That's an indirect effect, it seems to me. You say it's the reason for it regardless. Isn't this a regulation that at least is focused on trying to prevent conflicts of interest from big law firms hiring long-term contracts with court reporters, and that has some, shall we say, plausible basis, and it's not directly price-fixing? So I understand why you're emphasizing this other, but deal with it on its own terms. Why? Is it because it has that potential and it's the market itself, six out of nine, that's doing it, and so we read, at least at this stage of the litigation, the right for you to continue? That's right, Your Honor. So two points. One, with respect to the volume-based discount prohibition, if that happens, if two parties agree, competitors agree, we will not engage in volume-based discounts. That's price-fixing. Two, we've not just alleged volume-based discount prohibition, but we've also alleged that the Board engages in all kinds of other conduct related to its administration of the statute and unrelated to the administration of the statute that is also price-fixing in a much more rank, direct way. The State could say legitimately, look, we think contracting shows impartiality, it shows partiality, and so we're going to ban it. But, and it would be able to do that plausibly and achieve a result that this Court could not overrule, except when, like in this case, the State is given its power, its regulatory authority, its discretion, to private parties who are, have every interest in abusing that power. That's the whole point. All right, count.   It's rational basis if done by a traditional State official, but it's not rational basis because it's done by a privately controlled Board. So nothing dealing with this specific concept, but if you go back to the Fisher case for the Supreme Court that says that rent control, a full regulatory system that controls for rents, is perfectly appropriate, the State can do that. And then you compare that and contrast that with St. Joseph Abbey, a Fifth Circuit decision here, which says that regulations that are purely protectionist and have no other purpose do not pass rational basis. Here, the reason this economic regulation does not pass rational basis is because once it's controlled by private parties, it then has no other purpose other than protectionism, because the Court reporters, our competitors, have no other incentive other than to cheat. Thank you, Your Honor. Do you have a different take on all this? Excuse me, Your Honor. Do you have a different understanding of all this? Slightly, Your Honor, yes. I think that could be fairly stated. May it please the Court, Your Honors, Joshua Force, on behalf of Louisiana Board of Examiners of Certified Shorthand Reporters, I'm joined at council table by David Marcello and Brandon Key, and we're also joined in court today by Special Assistant Attorney General Elliot Baker. The issue before this Court is whether a State, the State of Louisiana, has the right to enact and enforce a State statute that prohibits court reporters from accepting employment from a firm or a person, regardless of their State of residence, that has a contractual relationship with a party litigant to provide court reporting services. That's what Article 1434 does. In 1995, the Louisiana legislature enacted 1434, and it did so to ensure the reliability and the integrity of court reporters and the deposition transcripts that they produce. Were there concerns that there were incidents of corruption? Where did this legislation come from? Your Honor, it came from very brief hearings, as far as I'm aware. The record doesn't actually contain the legislative history, but it's reflective of the code of ethics that the Board has adopted that has very specific requirements as to into what kind of relationships court reporters can enter, and more importantly, what they have to do in interacting with their customers and also with protecting the deposition records that they create. So it's entirely consistent with the ethical regulations that the Board has promulgated and has administered during this period of time. And as a result of that, it's very different than the St. Joseph Abbey case that counsel mentioned a moment ago, because in that case, as this Court found, the only justification that was rationally related to that particular regulation was the economic protectionism that the Board itself in St. Joseph supported that legislation, in fact, in that regulation. In fact, this Court found that the regulation did not rationally relate to the regulation of the funeral profession, because the State didn't regulate the use of caskets in any other way. In fact, at the time, at least, Louisiana didn't require funeral remains to even be buried in a casket. What about the Sherman Act claim? What do you make of this agenda item, how to increase rates? Your Honor, I think that that particular agenda item is taken completely out of context. All that Veritex has quoted to you is the one phrase, how to raise rates. But Veritex hasn't — Pretty bad phrase. Excuse me? Pretty bad phrase. It is. And that's why they repeat it over and over again. But they omit the context in which that agenda item is written. And what it says is, it relates to the advisory committee, and it says that they're going to discuss the future of the profession. Trending towards more voice writers, open discussion on why reporters are moving to CART-slash-captioning, mainly due to low wages at a freelance level. One of the things that the Board was grappling with at this time, and this is 2016, so it's years after the 1995 enactment of 1434, and it's two years after the legislature enacted the safe harbor provision in Revised Statute Section 37,2556D, which expressly codified the Board's enforcement and interpretation of Article 1434. But this agenda item has nothing to do with Article 1434. It has nothing to do with court reporting firms. What it addresses is that the Board recognized that fewer people were entering court reporting schools, and even existing court reporters were moving from traditional court reporting to other transcription services. And the question was, how are we going to ensure that in the future there are actually court reporters? It's something that Veritex actually should have an equal concern for, because the extent that Veritex wants to hire court reporters in Louisiana, they need to exist. And that's all that the committee was talking about. And quite frankly, Your Honor, it doesn't even reflect in the record that this meeting ever took place. It occurred in August. It was supposed to occur in August 2016 at a time when there were massive floods in Baton Rouge, and the meeting actually never even took place. As I understand it, we're not here talking about the merits of antitrust liability. We're here talking about the immunity, whether or not your — Your Honor, I think we're talking about two things. First, on the face of the amended complaint, Veritex has not pleaded a prima facie claim for antitrust violations under the Sherman Act. As this Court held in Green, there are essentially three components to the claim that Veritex needs to plead. It has to plead that the defendant's conspiracy caused an anti-competitive effect in the relative market. But that's not what Veritex has pleaded. What Veritex has pleaded is that this statute, Article 1434, caused an anti-competitive effect in the marketplace. That's not a conspiracy of the defendant's, and it doesn't prove, or it doesn't allege, I should say, that it's the defendant's conduct that caused the anti-competitive effect. It says that the statute caused the anti-competitive effect. If there's any question about that, Your Honor, all the Court needs to do is look at the amended complaint itself, because this did come to the Court by way of a motion to dismiss, and the lower court's orders granting that motion to dismiss, and, therefore, the allegations in the complaint are dispositive. In the very first paragraph of Veritex's complaint, which appears in the record at page 53, Veritex says, quote, in this lawsuit, Veritex challenges a State statute, Louisiana Code of Civil Procedure, Article 1434a2, which purports to prohibit court reporters in Louisiana from entering into long-term or volume-based contracts with frequent consumers of court reporting services, close quote. In the second paragraph of the complaint, Veritex focuses on the legal basis for its Sherman Act claim, and it says, quote, the decisions, actions, agreements, and policies of the Board and court reporters to enforce Louisiana Code of Article of Civil Procedure, Article 1434a2, and insulate court reporters in Louisiana from competition also violate Section 1 of the Sherman Act, close quote. Allegations like that permeate this amended complaint, and they culminate in Veritex's prayer for relief. And what is it that Veritex asks for in its prayer for relief? Well, the first thing it asks for is a declaration that Article 1434 is unconstitutional. The second thing that Veritex asks for is an injunction, an injunction to prohibit the Board from enforcing and taking any actions to enforce Article 1434a2 against court reporters or Veritex. This lawsuit is not about actions that the Board took, other than to enforce 1434a2. And it's important in looking at the Sherman Act claim to recognize that it's the statute that underlies Veritex's complaint in this lawsuit, because even counsel conceded Veritex cannot sue the members of Louisiana legislature under the Sherman Act for enacting Article 1434. I mean, they could do it, but it would be immune under Parker. And it makes no sense to say that Veritex can circumvent that immunity by suing the individual members of the Board for merely enforcing Article 1434. Just to clarify that, it sounds like your argument today is you don't need the immunity. You're entitled to dismissal because they haven't presented a prima facie case of antitrust liability. Your Honor, we have multiple arguments. The first is that they've not pleaded a prima facie case. The second is, even if the Court finds that they pleaded a prima facie case, that the individual Board members are immune under Parker. There's a third argument, and it goes to one of the questions that was asked earlier regarding what has been pleaded in this case, and that is that even if, in theory, dental examiners requires MidCal to be applied to this particular State Board, it would only do so to the extent that the Board is dominated by active market participants. And the amended complaint does not sufficiently plead that this Board is dominated by active market participants. It is true that Veritex alleges a number of times that six of the nine members of the Board are court reporters, and it's true that Veritex alleges a number of times that they are active market participants and they dominate the Board. But that's not sufficient under Louisiana law. As we've pointed out in our briefs, in the revised statute, Section 37, 2555 and 2556 distinguishes between two different types of court reporters, freelance court reporters and official court reporters. Freelance court reporters may take depositions in Louisiana. Official court reporters may not take depositions in Louisiana. Official reporters are employed by courts exclusively, and they're paid by their salary. So they are not active market participants in the market that has been defined for this Court, which is court reporters who take depositions. I'm sorry. I want to make sure I understand. Are you saying that not all six of the nine are active? I'm saying two things, Your Honor. First of all, that the pleading does not distinguish between official and freelance court reporters, and therefore merely saying that they're court reporters doesn't establish a prima facie claim that the Board is dominated by active market participants. It is — If you know it or if it's in the record, of the nine, how many are the freelance category? Of the nine, at most, four would be members of the freelance. So our argument on — Is that your knowledge, or is that part of the record? I would say, Your Honor, that is not in the record. That is my knowledge, and it was subject to discovery in between the judges' two orders, one on the original motion to dismiss and one on the motion for reconsideration. All right. I take it your point is it's up to them to plead. Right. Yes. Right. I mean, this Court, in considering an appeal for motion to dismiss, as the district court, has to take the well-pleaded facts as true. Our point is that merely saying that six of the nine are court reporters doesn't prove, even if true, that the Board is dominated by active market participants because, to the extent that members of the Board are only official court reporters — I shouldn't say only — are official court reporters, they are not active market participants. They don't participate in this market of competing for and taking depositions. And therefore, they don't have the kind of self-interest that counsel talked about for — for freelance reporters. Is that selection discretionary? I mean, it's not required that two be court reporters, four be freelance? I mean, that's — when you're looking at who gets appointed, there's not credentials required for the individual positions where you have to have two court reporters? No, Your Honor, the Board is comprised of nine members, some appointed by the Governor, others appointed by — by the legislature. There is a judge, there are two lawyers, and there are — But there's not specific categories that two court reporters have to be members? No. No. And — and this is something, though, where the facts of our case, as pleaded, differ from the dental examiner's case. The statute in dental examiners, under North Carolina law, required that six of the eight members of the dental Board not only be dentists but be engaged in the active practice of dentistry. And so there, on the face of the statute, you had the — the fact that the — the Board was dominated by active market participants. That's not the case here. The statute doesn't require that six of the nine members of the court reporter's Board be freelance reporters. The other difference, too, I think, that's important between this case and the dental examiner's case is that in dental examiners, the Board acted ultra-virus. The statute at issue was a very general one that — that gave that Board the authority to regulate the practice of dentistry. Because of complaints that the members of the Board received from other dentists who were not happy that non-dentists were performing teeth-whitening services, the — the Board sent out 47, I think, cease-and-desist letters and also prevailed upon other organizations to stop the non-dentists from practicing teeth-whitening. Now, the — the statute that created the Board gave the Board some enforcement authority. It allowed the Board to file lawsuits to enjoin non-dentists over whom the Board did not have regulatory authority from practicing dentistry. And the Board also had notice and comment rulemaking authority. But the Board didn't follow any of those procedures. It decided unilaterally that to shut down non-dentist practice of that particular procedure. That's not the situation here. In this case, the Legislature has been very specific in prohibiting employment relationships between court reporters and party litigants, either direct or indirect. And that's — that's what the Board said in 2012 it was going to enforce. So this case does not involve either a situation where the Board has acted ultra-virus. It also doesn't involve a situation where you're looking at interstitial policymaking done by the Board. The Council characterized what 1434 did previously, but in looking at what the statute actually says, there are two parts that are important. Subsection A1 is the Legislature's decision that only officers who are authorized to But officers who are either lawyers or employees of party litigants or are otherwise interested in the outcome of the lawsuit may not take depositions. That raises the question, who is an employee? Subsection A2 defines prescriptively who an employee is, and it's anyone who has a contractual relationship with a party litigant to provide court reporting services, or anyone who accepts employment from a person who has a contractual relationship to provide court reporting services to a party litigant. If there's any doubt as to what the Legislature meant, in 2014, the Legislature responded, as Veritex has alleged, to concerns regarding the enforcement of Article 1434, and the Legislature actively and actually supervised the Board by enacting the safe harbor statute that appears in the revised statutes. And that statute, very, very clearly, I think, codifies the Board's interpretation and enforcement of 1434 because it creates a safe harbor from that enforcement if certain things are done, and it also codifies the Board's responsibility and authority for enforcing 1434 and instructs the Board to create a certification process so that court reporters can enter into employment relationships with persons or firms and have security that they're not in breach of 1434. There's a direct relationship between those two statutes because the safe harbor statute says that a court reporter is not to be considered an employee, the language of 1434, if the court reporter obtains a certification from a court reporting firm that the firm does not have a prohibited contractual relationship with a party litigant. And therefore, even if this Court gets to the second prong of the MidCal test, not only was there active supervision here, Veritex has pleaded that there was actual supervision because the Board announced it was going to start enforcing in 2012, and Veritex tells you that in 2014, the legislature enacted the safe harbor statute. Turning to Veritex's constitutional arguments, they should fare no better, and quite frankly, the argument I think that was just made confuses Veritex's constitutional claims. Both parties recognize that the rational basis test applies to the equal protection and due process claims, and as a result of that act of the 1434 is presumptively constitutional, and Veritex has to disprove any conceivable interest that is promoted by Article 1434. In the Goldberg case, the Supreme Court recognized that States have a legitimate interest in regulating professions, and in particular, lawyers who are officers of the Court. Under Article 1434a1, court reporters are also officers of the Court, and as a result of that, the State of Louisiana has a legitimate interest in regulating court reporters. Throughout this litigation, we've identified a number of different legitimate interests that this statute serves in protecting the integrity and reliability of court reporters as well as the deposition transcripts. And Veritex doesn't dispute that. In its brief in this case, Veritex admits that it, quote, does not dispute that the State may pass laws and regulations to advance these objectives, close quote. The St. Joseph Abbey case that Veritex relies upon doesn't require a different result than the one that the district court judge reached, because in that case, this Court found that there was no rational basis for the regulation of the funeral profession and that the only purpose that the State could rely upon was economic protectionism. But that alone did not establish the constitutionality of that particular regulation. The facts of this case are much more closely aligned with this Court's previous holding in the Greater Houston Small Taxicab Company owner's case, because in that case, the Court recognized that even if the legislature there, the municipality, had some motive in part to promote economic protectionism, and there's no record evidence in this case that that was the legislature's motive, but that the statute is still constitutional so long as it serves another legitimate State interest. And here that State interest is in ensuring the reliability and integrity of court reporters and the deposition transcripts. The district court applied rational basis to both equal protection and due process and recognized that there were legitimate interests which Veritex does not dispute. The fact that there may be other interests that Veritex can argue are served by that statute as well does not establish the statute as unconstitutional. We ask that the Court affirm the district court and dismiss Veritex's claims in its amended complaint. Thank you, Your Honors. Roberts. So what you just heard was a factual argument. And factual arguments are inappropriate on motions to dismiss. The district court twice, not just once but twice, found that we had stated allegations sufficient to state a viable antitrust claim. With respect to the issue of control, that is, as the State of Louisiana has argued in front of the FTC just a couple months ago, a requires resolution after a full record. Here we have alleged majority control by court reporters. We've also alleged that those court reporters each have a financial interest in increasing rates. We've also alleged that there are two different categories of court reporters. We did not address the issue of two different are actually in the private market. So we've alleged that they — All financial? Yes. That they are all financial. But on your point that at least two of them are court-appointed and do not participate, they can't do depositions. It's not in the record. It's not part of our — it's not part of our — I could not tell you that particular — You're saying you've pled sufficiently to beat immunity based on the six. That's right. And what you've just heard, this question that you've just raised, is the question of fact. But it's only one of many questions of fact related to control. And see, Dental was very, very clear. It's not just who has majority control, but clearly there's majority control here by private market participants. It's also what is the risk of regulatory capture? What is the risk that private market participants will use this board for their own anti-competitive purposes? And we've alleged that. We've alleged not only is there risk, but it's actually happened. And that means there's been regulatory control. What do you make of what they've said today about the how to increase rates, that this had nothing to do with 1434? So two things there. One, our case is not just about the administration of 1434. We do allege 1434 is part of what this board is doing for their own private purposes. But we also allege that the board goes well beyond anything related to 1434. One of the things we allege is that, in fact, they are getting together and exchanging price information without any supervision, agreeing on prices and how to raise those rates. And what, again, the complaint alleges is that that meeting agenda was just direct evidence of that type of conduct. Pardon my ignorance. I need to refresh my recollection here. What does your complaint seek besides stopping 1434? Oh. So if you go back, the same paragraph that they quoted from in the second remedy, one for injunction, it does ask for a remedy to stop the enforcement of 1434, but then it goes on. And the vast majority of that paragraph in the prayer for relief, paragraph No. 2, deals with requesting that the court prohibit the board members from engaging in any other conduct that is anti-competitive. And it has a whole list of the types of anti-competitive conduct that it is asking for injunction on, which would include the price fixing, which would include the boycott. Another action that has happened here that we've not focused on too much yet is that, in fact, this board has targeted my client. They've issued a notice of investigation to an out-of-state company over which they have no jurisdiction over. And they've done that for purposes of publicizing it as a deterrent of court reporters from working with us. And that's problematic. Now, with respect to rational basis, the judge did not conduct a rational basis test. It identified a potential legitimate purpose and then assumed that the statute achieved that purpose. Rational basis also requires a fact-intensive investigation. It is deferential, but fact-intensive. It's not toothless. And that is what's the step that was skipped here. With your permission, I would just ask for a prayer for relief that you overrule the district judge or alternatively remand with instructions to allow us an opportunity to amend. Thank you. All right, counsel. To both sides.